Good morning, your honors. I'm John Tulak for the Pacific West Group, and if it may please the court, I intend to be limited in my remarks as the last case on the docket. In terms of prepared remarks, I don't have a lot to add that isn't in the briefs by both parties. I ask you about the amount of money that's at stake in this for two reasons. One, is there diversity? Does it meet the diversity standard for damages? And how could you possibly litigate to the extent that you have over $72,000 without making any effort to try and sell this case? Because it can't possibly be worth what's been expended. I don't understand how you could possibly be doing this from an economic standpoint. I agree with you 100%, your honor. This makes no economic sense. We have two parties who could afford to fight, and they fought. There were opportunities to settle, and I think the parties in good faith attempted to settle, and that didn't happen. And so we're here. There's no attorney fee provision for the winning party. This was a case originally filed in the state court as almost a file and forget. It's just taken to trial, and here we are. That's just what happened. As far as the diversity jurisdictional question, it is based on the fact that it was removed to federal court and it stayed there because there was a punitive damage provision as to fraud, and that put it over for the amount in controversy. There was no express amount sought for punitive damages. It's just that punitive damages, the evidence might show. That's how we do it in California. In state court, we cannot plead a specific amount. I just, as a former transactions lawyer, this one just baffles me. Here you've got some presumably very sophisticated parties. Seems like nobody would bother to read these documents. You've got Texas law, an as-is situation. Why aren't you just out of luck? Because I don't think that as-is clause is as broad as has been argued. You'd have to look at that clause. You'd all have to look at this clause and say to yourself, here's what it means. And then you would meet and confer, and you were all exactly 100 percent on point in agreement. That's not what an as-is clause is, at least as Texas law interprets it, is it? That's exactly how it's being argued here, Your Honor. And it goes one step further, because what does that mean in the distressed note market? Two parties that do have that knowledge. Especially in the distressed note market. I would think that a sophisticated buyer, as your client apparently is, has an opportunity to be represented by counsel and so on, obviously well represented in yourself. I just don't understand this. This makes absolutely no sense to me. I know it doesn't to Judge Corman in terms of the economics of it, but how can you say that when you're dealing with distressed notes, you've got these people who are set up to look at things that didn't bother to look at them. It doesn't turn out well, and you say, hey, you know, you guys, these warranties, but you have a statute that says when you don't follow certain things, it's as-is. Meaning, buyer beware. What you see is what you get. Why isn't that this case? It's more complicated than that. But it's really very simple. At the heart of it is, what is being purchased? And then how is it being purchased is the second question. You have the two together. The first part is, what's being purchased? Everybody knows it's a distressed note. So how do you determine which ones to buy, and what value do you place on it? What price are you willing to pay? You assume the risk of whether it will ever perform after that. But you will buy some and reject others. So how do you do that? You look at the files. You look at the position. You evaluate it. Your buddy didn't bother to do that, I gather. He did look at the files. It's our contention those files were stripped as to some material information. But you don't always look at the files you buy distressed notes. When you have a relationship with one another, and sometimes even when you don't, the custom and practice in the industry is you know you're going to get the entire loan file afterwards, including the loan origination file. You're going to have a complete record. You do have an opportunity for a do-over if you didn't get what you bought. What do they expect to buy in this case? You say that based upon custom and practice in the industry? That's custom and practice in the industry. Why? Because you do have all this documentation to look at. There's an obligation to deliver over those entire files. So you're saying, wait a minute. This is flying in the face of 37 years of experience on my part in the transactions area. You're telling me that your clients were offered a set of what I call subprime mortgages. And it doesn't really matter whether they look at them at this point, and it doesn't matter whether everything was in the file, because after you purchase them, you're going to get the record, and at that point you have some kind of an implied right to go back? Is that what you're telling me? No, not precisely, Your Honor. What I'm getting at is do you get what you intended to purchase? Not the quality. What you intended to purchase. Where is that documented? What in the record shows in advance of the purchase what it was you were intending to purchase? The record, I think, is really not in dispute in terms of procedurally how we got to the point of these notes being purchased. The notes were represented to be certain things. The testimony is we don't buy unsecured notes. We generally buy only second positions. In this particular case, there was one purchase of a note that was represented to be a first. So what was actually delivered? It wasn't a first. It wasn't a true first. It was a second. Well, didn't you get title insurance to find out? You don't generally get title insurance in advance of the purchase. Always get title insurance. Not in advance of the purchase of the notes. You always get title insurance if you're buying these notes. Anybody that doesn't do that is a doofus. I mean, that's crazy. You always buy title insurance. And that's why I don't understand this. The whole thing seems to be a sophisticated company, seemingly sophisticated, that has not followed standard operating procedures if you're going to buy these kinds of notes. I don't get it. I really don't get it. You don't know whether you have priority in terms of liens unless you get title insurance. You don't know that. I mean, again, this doesn't make any sense to me, and your argument that this is a little more sophisticated or this or that or the other is flying in the face of just basic economics, and I don't understand your position. I don't think I used the word sophisticated. I think I said a little more complicated, but it's really down to something very simple. And I agree with you in terms of what you might do as a transaction attorney, what I might do as a transaction attorney in the same industry may be very different than what actually happened here. But the fact of the matter is we're dealing with two companies that deal with this in volume, and you look at a lot of these things, you make judgments about them, and you make purchasing decisions. But once you've made a purchasing decision, did I get what I actually bought? Not in terms of quality, not whether you'll ever get a dime out of it from the parties, but did I get the note that I intended to purchase? In these three cases, a sophisticated guy with a lot of experience says, you know what, I could have made a mistake on one, but all three, that material information isn't there. I don't think so. That was your guy saying, you know, I don't normally do this. I usually check things, but maybe I didn't do it. It doesn't make any sense, but you still have the burden. Are you saying that's your best evidence? The best evidence is that what ultimately this turns on, Your Honor, is credibility and intent and things which can't be solved on paper. It requires a trier of fact to make a decision. That was true as to judgment of pleadings. There's hard evidence that the files were stripped. Because you go right to credibility with that. I don't see anything in there other than I don't remember whether I looked at the files or not. I just wouldn't have done that. I mean, that's kind of it. So are you saying those statements alone raise a reasonable, triable issue that the files were stripped? I think that is the base of it. But there are further inferences that can be drawn from some of the other evidence, including an e-mail from one of the people who is dealing with the Pacific West Group who says back to his boss, I don't know how they're going to make any money on this. I don't know why they buy these things. That suggests that there was something that was off here. Mr. Postol certainly wasn't the one who prepared the files and didn't remember anything that was in the files that wasn't his job. So it's not like there's a smoking gun from that young man that, yeah, yeah, we're seeing what we can get away with here. But I think it's unfair for a court at the pleading stage or at summary judgment stage to say, you know what? We're not going to have any assessment of credibility other than what I see on paper or intent of the parties. Well, you have to have a base for it. I mean, that's what I'm trying to figure out. I don't know anything about transaction stuff and whether this was stupid or not stupid. But I do know a little bit about summary judgments. And so what I'm just trying to look for is where in this record, I know that Realtime put in a ton of evidence that it did everything by the books. And I'm looking to see where a collision of fact was created by Pacific West. And I can't find it other than somebody saying, you know, geez, I can't remember. Or saying, you know, we really don't buy stuff like that. I think that goes to the essence of this kind of transaction. Mr. Cotton, who's experienced, says, I don't specifically remember, but I have a hard time believing I would have missed this all three times on the three that were actually purchased. He looked at a number of files. Mr. Anderle testified very honestly. He says, yeah, we take our chances. And we lose on some of these. But he said, I at least want to get what I thought I was buying. I didn't get that. But there's no indication of what he thought he was buying. Oh, yes. I mean, I just don't remember. Look, he doesn't say, you know, I look for A, B, C, D, and E. I look for that in every single file before I give a thumbs-up to my boss. I look through these files, and I found A, B, C, and D. And then we got the whole thing, and we look at it, and son-of-a-gun, D is missing. Or E and F now show up more accurately. In terms of the record in the pleadings themselves, I would have to agree with you. I didn't include the very detailed explanation that Mr. Anderle gave. Why isn't that enough in and of itself to affirm a denial of summary judgment? Because there isn't a collision that requires a trial to resolve. The record, which I believe includes the entire transcript of both Mr. Anderle and Mr. Cotton, does have that. I've read them. I just don't see anything other than I don't remember. Mr. Anderle gave a very detailed, it went on for a number of pages, of the different things that he looks at in terms of making a decision to purchase or not to purchase a note, much broader than the three notes that were particularly in question here and that were purchased. I honestly think that sometimes the obvious that we take for granted sometimes gets overlooked. In fact, the California Supreme Court just recently reminded us about credibility and intent being jury questions, prior fact questions, and that ambiguity gets resolved against the parties. It would appear that, in fact, literally if not in spirit world, literally speaking, the three notes were exactly what you thought they would be. Maybe they were going to turn tail very quickly, but literally on the day the transaction went down, they were as represented. I honestly can't agree with that. Do you disagree with that? Yes, I do, Your Honor. And how come? A first is, it was not a true first. That was a recording error that real-time resolutions was aware of and didn't disclose and didn't correct. That's what title search produced, right? That's what title search could produce. Didn't it show a first lien? It did not show an unclouded first lien. If you looked at it after the fact and you see the litigation that was being threatened in Colorado over that, that's not something that, unless it was filed, would have shown up in a title report. It would have shown up as a first. You need a case filed with a list pendens for that to be a cloud on the title. That would put the first into question. Okay? As to the other two, you have procedural things in terms of where those notes were in a foreclosure process, in a bankruptcy process, resulting in stripping of the interest of those second. Those are material things. Those go to the thing purchased, not just to any quality that might be associated. Do you get anything out of this? And it would certainly bear on whether or not you would choose to purchase this one as opposed to some other dumpy note that you think you can work with. Again, we're working with junk. But how do you find some treasure out of the junk? It's not a blind pick. And so if you don't get what you asked for, if you didn't get what you thought you were purchasing, you basically have been handed completely worthless paper. It's like, what kind of horse did I buy? I bought a specific horse, not any horse. But your people didn't look at the horse's mouth or any other part of it. They didn't look. In retrospect, it's easy to say, gee, we could have asked some more questions or done this or that. But it goes against custom and practice when you have a file and you don't expect somebody to lie to you. I don't want to prolong this unduly, but what in the record shows the custom and practice to which you make reference? Again, my experience is that the custom and practice is entirely different than what you've described. So I'm interested to know where in the record you show a custom and practice that shows otherwise. Mr. Enderle's declaration indicated that we will rely because we're going to get a file. Why would somebody lie to us? Why would somebody conceal something when they have to give us a whole file? Now, you might say, gee, that's a little bit naive or I wouldn't do it that way. But it is at least understandable when you're going to receive an entire loan package that you wouldn't expect somebody to say X is not X. It's something else. Or to say something isn't in there or say something is in there and it isn't. You wouldn't expect that when you're going to get the hard evidence afterwards. The evidence on the record of the custom and practice is this gentleman's declaration. Mr. Enderle. That's it. That's it. There's nothing else. No, Your Honor. All right. Okay. Thank you, Mr. Klein. Thank you. May it please the Court. Leslie Greathouse for Appellee Real-Time Resolutions, Inc. There is no evidence. When the allegations were all boiled down, when they were put to the proof, Pacific West could not make its case. It's that simple. Here there was an enforceable, conscionable contract. It contained a warranty waiver or as-is clause. Pacific West could offer no evidence of fraudulent inducement or impairment of inspection rights so that it could overcome the warranty of waiver or as-is clause that it signed. Well, if the files had been stripped, would they have overcome it? Wouldn't that have been sufficient? But there is no evidence that the files were stripped. That is precisely the point. There was no evidence. Well, this representative of theirs in Texas said he would have never, he said he can't remember what he saw in the files because he reviews thousands, hundreds, whatever, of files. But he would never have submitted this to his employer and suggested they go ahead if these materials had been in the file. He says that it's not credible that he could have made a mistake. He says he could have made a mistake, but he says it's not credible that he would have in these three cases have approved these loans if the files had been what they turned out to be. And the evidence was that he only reviewed one of the three files. All three files were made. But he didn't remember whether he had remembered. Did he say specifically that he didn't review the other two or that he didn't recall? He testified that he reviewed one of them for sure. Another, he testified that he did not ask to review any of the California loans. So the one that is a California loan, we know he did not review. And he was not sure as to the third. With regard to the one that he did review, he had no recollection of what was in it. So there's no way that on a fraud claim he can prove that he was defrauded. He doesn't know. He doesn't remember. There is no other basis for evidence. And under Texas law, don't they have the burden of proof to show they fall under the exemption? They do. And they have no evidence that they were fraudulently induced. They have no evidence that they were impaired in their inspection. And therefore, they can't overcome that warranty waiver or as-is clause under the Texas Prudential case. Well, were they a reasonable purchaser? Had they known of what was in the file, the true facts? Would they have made this purchase for these three loans for $72,000? Well, this is the distressed mortgage market. Right. So each of these loans are sold at a significant discount from what they were. And they varied in price from the low one being sold for $5,000. When you're buying a mortgage for $5,000 on an as-is clause, there's a pretty good indication there that this is not going to be a terrific loan. As my esteemed opposing counsel said, we're dealing with junk. Up to the highest priced one at a little over $41,000. So they're priced according to what the possibilities are in those files. These are sophisticated people who deal in precisely these kinds of loans. Now, there were some questions. But you said they're priced precisely because of what's in those files. And my question is, knowing what was in those files, assuming that the files were not stripped, would anybody have paid this money? That's my question. In other words, I understand they're all encumbered. These are junk. But you make a valuation, and it's based on certain assumptions. And it seems to me it might be relevant to hear what they were really worth if the truth be known. Well, Your Honor, there is no evidence in the record, one way or the other, about what a reasonable person would do. I don't know why these people are purchasing this. That particular email, the record at the supplemental record submitted by us at page 25, that particular email is discussed. There is no evidence in the record that that email has anything to do with the three loans that are the subject here. It was part of a package of documents that were produced. When my client put the loans up for sale, it didn't just put these three up. It had many, many loans that were up for sale. There were many purchasers looking at them. There were all kinds of emails going back and forth to investors over these. And that email was contained in this packet of emails across a variety of investors. So there is an indication that that email has anything even to do with Pacific West, much less these three loans. So, yeah, there's an email, but I don't think there's anything that ties it to the subject matter of this case. Pursuant to what request was that? What? That email must have been turned over pursuant to a request. What was the request that resulted in that email being turned over? Your Honor, I do not remember the discovery of us. Wouldn't that be relevant? In other words, if they said, give us all of the emails, hypothetically, that relate to this transaction, and you gave them that particular email, wouldn't that be sufficient? If the email or if the request was limited to this transaction, if the request was for all correspondence related to the loan groupings that were put up for sale, that could be entirely different. And I'm sorry, Your Honor, I simply do not recall what the exact discovery request is at this stage. As for the question, there was some factual things that I wanted to clarify about the priority of the liens, and I believe that, Judge Remmer, you had it absolutely correct when you said that the facts proved out that the loans were exactly as they were stated to be at the time they were sold. The Pacific West has indicated that it only wanted to purchase secured loans. All three loans were secured at the point that they were sold. In fact, the loan that was sold as a first was recorded first in time. In Colorado, it is a time-recording state, so when Pacific West, or excuse me, when Realtime's mortgage is the first in time, it is considered the first. Now, it is also true that there was a threat for an equitable subrogation case, because the mortgage that was recorded second in time believed that it should have been first. But the fact is that the Realtime mortgage was recorded first in time. Those facts were contained in the file and were available for Pacific West to look at. The fact is that Pacific West chose not to review all three of the files. And the one it did review, it didn't seem to be bothered by the evidence that was located, or the information that was in that file about what made it a potentially junky mortgage. The other issue here has to do with the breach of contract claim, which was also dismissed. There were no warranties made in the contract. Thus, Pacific West was explicitly agreeing that Realtime made no warranties. In other words, they agreed that Realtime made no promises that the notes and the deeds of trust were as they were allegedly represented. So it follows that the judgment on the pleadings was appropriate, because there could be no breach of contract in that scenario. Even if the court did take the allegations of Pacific West as true, it couldn't be entitled to judgment where the contract contained no warranties or statements about the level at which the loans were secured. Unless Your Honors have any other questions, I believe I will conclude. Can I ask you? I'm sorry. Sure. This is just a practical question. Did you ever make any attempt to settle this case? Yes, there were settlement discussions. Pacific West has no evidence to overcome the warranty waiver or as-is clause. Thus, Realtime could not have been the cause of harm to Pacific West. Likewise, there could be no breach of contract when the contract itself disavowed all warranties. As Judge Smith put it, they are out of luck. This was a buyer beware situation, and it was a situation where what they saw was what they got. Thank you. Counsel, both of you, thank you very much for your argument. The matter just argued will be submitted and the court will stand in recess.
judges: Rymer, Smith, Korman